UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

WILLIAM LAWRENCE,

        Plaintiff,

v.                                                                    Case No.  8:18-cv-738-T-24 TGW

ACE AMERICAN INSURANCE
COMPANY,

        Defendant.

_____

USAA CASUALTY INSURANCE
COMPANY,

        Intervenor,

v.

ACE AMERICAN INSURANCE
COMPANY,

        Intervenor-Defendant.

_____/

## **ORDER**

       This cause comes before the Court on cross-motions for summary judgment: (1) USAA's

Motion for Summary Judgment (Doc. No. 102), which ACE opposes (Doc. No. 107); (2)

Lawrence's Motion for Summary Judgment (Doc. No. 104), which ACE opposes (Doc. No. 106);

and (3) ACE's Motion for Summary Judgment (Doc. No. 105), which USAA and Lawrence

oppose (Doc. No. 108, 110).  As explained below, genuine issues of material fact exist as to the

main issue of whether Wintersteen was covered under ACE's insurance policy.

## **I.  Standard of Review**

       Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must draw all inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. See Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006)(citation omitted). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. See id. (citation omitted). When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. See id. (citation omitted).

## II. Background

This case involves a dispute over whether ACE American Insurance Company's ("ACE") insurance policy issued to Jacobs Technology Inc. ("Jacobs") provides coverage for a car accident that Jacobs' employee, Benjamin Wintersteen, caused. The following facts are undisputed: In March of 2014, Jacobs offered Wintersteen a job that was to be performed in Germany. (Doc. No. 106-2). Wintersteen's job was connected to a government contract between the United States and Jacobs. Wintersteen was given an initial duty location of Tampa at the MacDill Air Force Base while his paperwork was being approved by the German government. (Doc. No. 106-2). Because Wintersteen would be relocating from New Mexico, he was given a $20,000 relocation allowance in order to assist him in moving his family and household goods, personal effects, and car to Germany. (Doc. No. 106-2). Wintersteen could choose how to spend the $20,000 relocation allowance as long as his specific expenditures were within the contractual guidelines authorized by the United States government, because the government would be

reimbursing Jacobs for the reimbursements that Jacobs made to Wintersteen from the relocation allowance.

Jennifer Petr, a financing and accounting manager for Jacobs, recommended to Wintersteen that he ship his personal car to Germany prior to leaving Tampa and use part of his relocation allowance to rent a car in Tampa, because it was cheaper to rent a car in Tampa than to rent one in Germany and the shipping process took several weeks. (Doc. No. 106-5, depo. p. 8, 32–33, 118). Jacobs had an arrangement with Hertz to supply discounted rental cars to its employees, even if the rental car was to be used for personal, rather than business, purposes. (Doc. No. 106-10, depo. p. 53–55). Specifically Jacobs and Hertz had entered into a Corporate Customer Agreement ("CCA"), in which Jacobs agreed to use Hertz as its primary rental car supplier. (Doc. No. 71-4, p. 2, 8). The CCA provides that Hertz will provide $100,000 in bodily injury coverage for Jacobs' employee-renters that rent a car for business purposes.[1] (Doc. No. 71-4, p. 7; Doc. No. 106-7, depo. p. 47). However, the CCA also provides that Jacobs, on behalf of itself and its employee-renters, rejects the inclusion of any supplementary insurance coverage in Hertz's rental agreements. (Doc. No. 71-4, p. 7).

While in Tampa, Wintersteen was driving rental cars from Hertz while his wife drove their personal car before it was shipped to Germany.[2] Wintersteen did not need a car to perform his job in Tampa, but he did need transportation to get to and from work (whether it be his

---

[1]Hertz deems that if Jacobs reimburses an employee for the cost of the rental, then the car was rented for business purposes. (Doc. No. 106-7, depo. p. 74).

[2]Wintersteen changed rental cars approximately every month while in Tampa, and he was in Tampa for approximately four months. (Doc. No. 106-4, depo. p. 9–10, 17). Wintersteen left Tampa to relocate to Germany on August 18, 2014. (Doc. No. 106-5, depo. p. 36).

personal car, a rental car, or a taxi/Uber/Lyft). Wintersteen's car was shipped to Germany on August 4, 2014. (Doc. No. 106-5, depo. p. 36).

On August 12, 2014, Wintersteen was driving a Hertz rental car in Tampa to pick up orange juice and fruit for his sick daughter. (Doc. No. 106-4, depo. p. 24, 27). Wintersteen intended to drop the orange juice and fruit at home and then go into work. (Doc. No. 106-4, depo. p. 24–25). However, on his way to the store, Wintersteen was involved in a car accident with William Lawrence. (Doc. No. 106-4, depo. p. 25). Wintersteen pulled out in front of Lawrence and caused Lawrence's car to flip over twice. (Doc. No. 102-1, ¶ 6; Doc. No. 104-8, ¶ 6).

As a result of the car accident, Lawrence sued Wintersteen in state court in May of 2015. (Doc. No. 106-1). Wintersteen made a claim for coverage under ACE American Insurance Company's ("ACE") commercial automobile insurance policy issued to Jacobs. ACE denied Wintersteen a defense and coverage under the policy.

Wintersteen had personal automobile insurance through USAA Casualty Insurance Company ("USAA"). There was also insurance coverage for the rental car through Hertz, which existed due to the CCA between Hertz and Jacobs.

In May of 2017, Lawrence, Wintersteen, and USAA (collectively referred to as "the Settling Parties") stipulated to an entry of a consent judgment to resolve Lawrence's claims from the car accident and to provide a means to collect part of the consent judgment from ACE. (Doc. No. 106-13). Specifically, the Settling Parties stated in their Settlement Agreement that they intended that ACE would be required to pay the amount of the consent judgment that it was legally required to pay had it honored its coverage obligations under the insurance policy. (Doc.

4

No. 106-13).

The Settling Parties stipulated that Lawrence's damages from the car accident were $750,000, and they agreed to the entry of a $750,000 consent judgment in favor of Lawrence and against Wintersteen. In partial satisfaction of the consent judgment, Hertz paid Lawrence $100,000 and USAA paid Lawrence $250,000. Thus, $350,000 was paid by Hertz and USAA on Wintersteen's behalf. In exchange for the $350,000 and an agreement not to execute against Wintersteen on the unpaid $400,000 remaining, Wintersteen assigned to Lawrence all of his rights against ACE.

Thereafter, Lawrence filed a declaratory judgment lawsuit against ACE in state court. In March of 2018, Lawrence's declaratory judgment lawsuit was removed to this Court. In Lawrence's second amended complaint, he asserts two claims against ACE: (1) declaratory judgment of coverage and damages; and (2) coverage based on promissory estoppel. (Doc. No. 72).

In May of 2018, this Court granted USAA's motion to intervene to pursue its related claims against ACE. (Doc. No. 27). In USAA's second amended complaint in intervention, USAA asserts four claims against ACE: (1) equitable contribution; (2) unjust enrichment; (3) declaratory judgment of coverage and damages; and (4) promissory estoppel. (Doc. No. 71).

All three parties—Lawrence, USAA, and ACE—have filed motions for summary judgment. However, in response, both Lawrence and USAA acknowledge that their claims for promissory estoppel fail. (Doc. No. 108, p. 2; Doc. No. 110, p. 3). Accordingly, the Court grants

ACE's motion for summary judgment on the promissory estoppel claims.[3]

## III.  Motions for Summary Judgment

The main issue in this case is whether the ACE policy provides coverage for the accident at issue.  If there is coverage, the three issues remain—USAA's claims for equitable contribution and unjust enrichment and the reasonableness of the underlying settlement amount.  Accordingly, the Court will analyze each issue.

### A.  Coverage Under the ACE Policy

Both USAA and Lawrence argue that the ACE policy provides coverage under the Hired Autos provision.  Additionally, Lawrence contends that the ACE policy provides coverage under the Non-owned Autos and Employees as Insureds provisions.  Accordingly, the Court will analyze each provision.

#### 1.  Hired Autos

The ACE policy was issued in California, and the parties agree that California law applies in construing the ACE policy.  The California Supreme Court has explained the principles governing the interpretation of insurance policies:

> [The] goal in construing insurance contracts . . . is to give effect to the parties' mutual intentions.  If contractual language is clear and explicit, it governs. If the terms are ambiguous [i.e., susceptible of more than one reasonable interpretation], [courts] interpret them to

---

[3]ACE also moves for summary judgment on USAA and Lawrence's claims for attorneys' fees pursuant to Florida Statute § 627.428, which provides for attorneys' fees when an insured obtains a judgment against an insurance company.  ACE contends that the statute does not apply to insurance policies that were issued outside of Florida, and the ACE policy was issued in California.  Fla. Stat § 627.401(2).  USAA and Lawrence concede that they are not entitled to attorneys' fees under § 627.428.  (Doc. No. 108, p. 2; Doc. No. 110, p. 10).  Accordingly, the Court grants summary judgment to ACE on this issue.  However, the Court notes that both USAA and Lawrence are still seeking attorneys' fees under the offer of judgment statute.

> protect the objectively reasonable expectations of the insured. Only if these rules do not resolve a claimed ambiguity do [courts] resort to the rule that ambiguities are to be resolved against the insurer. . . . To further ensure that coverage conforms fully to the objectively reasonable expectations of the insured, the corollary rule of interpretation has developed that, in cases of ambiguity, basic coverage provisions are construed broadly in favor of affording protection . . . . The existence of a material ambiguity in the terms of an insurance policy may not, of course, be determined in the abstract, or in isolation. The policy must be examined as a whole, and in context, to determine whether an ambiguity exists.

Minkler v. Safeco Ins. Co. of America, 232 P.3d 612, 616 (Cal. 2010)(quotation marks and internal citations omitted).

The Hired Autos provision in the ACE policy defines covered "Hired 'Autos'" as including only those autos leased, hired, rented, or borrowed by Jacobs.  (Doc. No. 63-8, p. 14). The ACE policy goes on to state that an "insured" includes anyone "while using with [Jacobs'] permission a covered 'auto' [Jacobs] . . . hire[s] or borrow[s]."  (Doc. No. 63-8, p. 15).

The issue in construing this provision is whether Jacobs hired/rented the rental car that Wintersteen was driving when the accident occurred.  There is no dispute that Wintersteen was driving a rental car.  However, the ACE policy does not define how to determine who, in fact, hired/rented the car at issue.  Furthermore, there is very little California case law to aid in this determination, and the existing California case law is based on distinguishable facts.

ACE contends that in order to hire a vehicle, the hirer must have dominion and control over the vehicle.  See Travelers Property Cas. Co. of America v. LK Transportation, Inc., 3 F. Supp.3d 799, 803 (E.D. Cal. 2014); see also California Civil Code § 1925 (defining "hiring" as "a contract by which one gives to another the temporary possession and use of the property, other than money, for reward, and the latter agrees to return the same to the former at a future time").

7

Thus, ACE urges the Court to determine who hired the car by looking at who had dominion and control over the car—Wintersteen or Jacobs.

ACE contends that at all times, Wintersteen had dominion and control over the rental car. Further, ACE points to the following facts to support its contention that Wintersteen rented the car at issue: The Hertz rental receipt had Wintersteen's name on it as the renter, and Wintersteen used his own credit card to pay for the rental. (Doc. No. 106-8; Doc. No. 106-5, depo. p. 47; Doc. No. 106-4, depo. p. 15–16). According to Petr, Wintersteen rented the car himself and was not acting at Jacobs' direction, nor did Jacobs place any restrictions on Wintersteen's use of the car. (Doc. No. 106-5, depo. p. 107; Doc. No. 106-3, depo. p. 44).

Lawrence and USAA dispute these facts, noting that the Hertz rental receipt also had Jacobs' name and address on it, the rental receipt listed Jacobs' corporate discount code, and Jacobs reimbursed Wintersteen for the cost of the rental. (Doc. No. 106-8; Doc. No. 106-5, depo. p.70). Further, Wintersteen stated that Jacobs (via Petr) placed restrictions on his use of the car in that he was not supposed to take it on long distance drives. (Doc. No. 106-4, depo. p. 22–23).

Many of the California courts applying the dominion and control test to determine if a vehicle was hired are faced with the issue of which of two parties to a contract that required the use of a vehicle to move/ship/haul items actually controlled the vehicle being used. See Keller v. Argonaut Ins. Co., 2009 WL 2569150, at *4 (Cal. Ct. App. Aug. 20, 2009); City of Los Angeles v. Allianz Ins. Co., 125 Cal. App. 4th 287, 292 (2005)(analyzing the term "borrow" rather than "hire" and applying the dominion and control test); American International Underwriters Ins. Co. v. American Guarantee & Liability Ins. Co., 181 Cal. App. 4th 616, 631 (2010); LK

Transportation, Inc., 3 F. Supp.3d at 803–04. This Court finds that solely analyzing who had control over the vehicle is too limited of a test in situations where the vehicle is claimed to have been hired at the direction of another or arranged for in significant part by another. Instead, the Court finds that certain cases outside of California, which are more factually similar, apply a broader test that looks at the entire rental transaction to determine who hired the vehicle. The Court finds that this broader test should be applied in this case to determine whether Jacobs hired the rental car at issue.

For example, in Continental Insurance Company v. McKain, 820 F. Supp. 890, 897 (E.D. Pa. 1993), one of the issues before the court was who hired the rental car involved in an accident. In McKain, Duncan dropped his car off at Reedman Corporation ("Reedman") in order to get his car fixed. See id. at 892. Because the car needed repeated repairs, Reedman agreed to provide Duncan with a loaner car. See id. at 893. Reedman had a longstanding, unwritten arrangement with McCafferty, a rental agency, to provide loaner cars to Reedman's customers in exchange for Reedman paying the base rental charge for the loaner car. See id. at 892, 898.

Reedman called McCafferty to arrange for a loaner car for Duncan, and a Reedman employee took Duncan to McCafferty. See id. Duncan signed a rental agreement and was not charged for the loaner, and he was given unlimited mileage due to the Reedman-McCafferty arrangement. See id. Additionally, because Duncan was a Reedman customer, McCafferty waived the requirement that Duncan provide a Pennsylvania driver's license and have his credit checked. See id. After taking the loaner car, Duncan was involved in a car accident. See id.

One of the issues before the court was whether Duncan was an insured under Reedman's insurance policy, which covered anyone using with Reedman's permission a covered auto that

Reedman had hired.  See id. at 897.  The court framed the issue as whether Reedman sufficiently participated in the hiring of the loaner car such that Reedman could be considered to have hired the car.  See id. at 898.  The court concluded that both Reedman and Duncan significantly participated in the rental transaction, stating:

> The court finds that Reedman did more than just facilitate rentals by its customers from McCafferty.  Reedman had an agreement with McCafferty with respect to the hire of automobiles for its customers. It negotiated a special low daily rental rate, which it paid, and it controlled which customers were authorized for such "loaner" cars. On the other hand, Duncan had control over the purchase of optional insurance and over the operation of the vehicle.  The court concludes that neither Reedman nor Duncan had exclusive control of the vehicle, but that both exercised some control over it.  Both Reedman and Duncan also had agreements with McCafferty with respect to the rental. The fact that Reedman's agreement appears to have been unwritten does not alter this fact.  McCafferty accepted authorizations from Reedman to provide cars to Reedman customers on special terms; McCafferty billed Reedman monthly for any outstanding daily rental charges for these vehicles.  The fact that Duncan signed a rental agreement with McCafferty is not dispositive of who is the renter for purposes of insurance.  Both Reedman and Duncan participated in important aspects of the rental, and the rental would not have occurred as it did without the active participation of both and the presence of the agreements which each had with McCafferty.  The court therefore holds that Reedman and Duncan co-hired from McCafferty the vehicle that Duncan was driving when the accident occurred, that Duncan was using the vehicle with Reedman's permission, which was necessary for Duncan to obtain the vehicle in the way that he did and without payment, and that, therefore, Duncan falls within the definition of an "insured" [under Reedman's insurance] policy.

Id. at 899–900 (internal citations omitted).

Likewise, in Hargrove v. Missouri Pacific Railroad Company, 780 So. 2d 454 (La. Ct App. 2001), the court analyzed who participated in the hiring of the rental car at issue.  In Hargrove, Haley took his car to Martin for repairs, and Martin arranged for a reduced-rate rental

10

car for Haley.  See id. at 456–57.  Martin had a verbal agreement with Enterprise, wherein Martin would contact Enterprise to provide rental cars for its customers and Martin would pay a portion of the rental car's cost.  See id.

Martin completed a purchase order stating that it would pay $10 per day for a two-day rental from Enterprise for Haley.  See id. at 457.  An Enterprise employee went to Martin to pick up Haley and bring him to Enterprise to obtain the rental car.  See id.  Haley was required to pay $15 per day for the rental.  See id.  Due to the arrangement between Martin and Enterprise, Enterprise required Haley to pay a $30 deposit rather than a $200 deposit.  See id. at 460.  After taking the rental car, Haley was involved in an accident.  See id. at 457.

One of the issues before the appellate court was whether the trial court erred in finding that Martin and Haley were co-renters of the rental car involved in the accident.  See id.  If Martin was a co-renter, then the rental car would be considered a covered auto under Martin's insurance policy with St. Paul, which covered vehicles that Martin rented or leased.  See id. at 460.

In finding that Martin was a co-renter, the appellate court stated the following:

> [The evidence] indicates that Martin acted as co-lessee with Mr. Haley.  St. Paul argues that Mr. Haley was the sole lessee of the vehicle as he had complete control over the vehicle's use and that Martin's involvement was only minimal.  However, the testimony indicates that Martin contacted Enterprise, paid a portion of the fee, and significantly altered the relationship between Mr. Haley and Enterprise in that a different deposit was required due to Martin's involvement. The cases cited by St. Paul demonstrating the factors of control are inapplicable here . . . .  Both parties were actors here and both were essential to the rental.  Neither do we find it controlling that Mr. Haley was the only authorized driver under the rental agreement. . . . Martin played a crucial role in the rental of the vehicle from Enterprise.  Martin issued a purchase order for a rental car for

a certain number of days and for a certain figure. To argue that Haley acted as the sole lessee ignores the reality of the situation. Thus, we find no error in the trial court's determination that Martin acted as a co-lessee, making the Enterprise vehicle one that [Martin] "owned, rented, leased, or borrowed" for purposes of the policy.

Id. (internal citation omitted). In finding that the rental car was a hired auto under St. Paul's

insurance policy, the appellate court stated the following:

Also, the [rental car] meets the definition of hired autos which are defined as "any auto that you hire, rent, lease or borrow from others, other than your employees or members of their households." Furthermore, Martin's dominion, use and control has been established under the facts and testimony presented in this case. While Mr. Haley did operate the vehicle at the time of the accident, his control of the vehicle extended no further. Martin controlled all the decision-making authority concerning the nature of the lease involved. Martin chose Enterprise, the type of vehicle, price of the vehicle, length of the rental, and permissive drivers. All of these factors were pre-determined by Martin and Enterprise. Therefore, substantial dominion, use and control was exerted by Martin in connection with the rental vehicle. Thus, the vehicle is a covered automobile under the St. Paul policy.

Id. at 463.

Based on McKain and Hargrove, when applying the dominion and control test to

determine who hired a vehicle, a court should not only consider who actually exercised dominion

and control over the vehicle, but it should also consider who had control over (or significantly

participated in) the rental transaction. Thus, if one arranges for another to rent a vehicle by

significantly participating in the rental transaction and paying for or reimbursing part or all of the

rental cost, then one can be deemed a co-renter. By being a co-renter, one has the right to

exercise dominion and control over the vehicle, even if the co-renter does not choose to actually

exercise that right.

As stated above, the Hertz rental receipt lists both Jacobs and Wintersteen, and there is a dispute as to whether Jacobs placed restrictions on Wintersteen's use of the rental car. Additionally, it is undisputed that Jacobs reimbursed Wintersteen for the cost of the rental. Furthermore, according to Wintersteen, Jacobs (via Petr) directed him to use Jacobs' travel agent, BCD Travel ("BCD"), to rent a car in Tampa, and Wintersteen complied. (Doc. No. 106-4, depo. p. 15–19). Petr stated that Jacobs relied on BCD to reserve vehicles in accordance with Jacobs' policies. (Doc. No. 106-5, depo. p. 47).

Wintersteen also contends that Petr told him not to get additional insurance for the rental car; Petr disputes this. (Doc. No. 106-4, depo. p. 30, 35; Doc. No. 106-5, depo. p. 55). Wintersteen points to a document called, "Global Rental Car Insurance Frequently Asked Questions" that he contends that Petr gave him and discussed with him in connection with her statement that he did not need to get additional car insurance for the rental car. (Doc. No. 106-4, depo. p. 66–67; Doc. No. 103-6). Wintersteen also contends that after the accident, Jacobs required him to fill out a vehicle incident report, submit to a drug test, and take a driving course. (Doc. No. 103-15; Doc. No. 103-16; Doc. No. 103-17; Doc. No. 104-4, p. 29; Doc. No. 106-4, depo. p. 69–70).

Based on the above, the Court finds that a genuine issue of material fact exists as to whether the ACE policy provides coverage for the accident under the Hired Autos provision.[4]

---

[4]Because it is disputed as to whether Jacobs directed or arranged for Wintersteen to rent the car, Lawrence and USAA's reliance on cases previously cited by this Court (in its order on ACE's motion to dismiss) does not change the result. See Abrams v. Trunzo, 129 F.3d 1174, 1177 (11th Cir. 1997)(finding that the employee was the agent of his employer when renting the car because the employee's travel orders included the specific instruction that he rent a specifically reserved car at a specific car rental agency); Royal Indem. Co. v. Metropolitan Cas. Ins. Co. of New York, 128 N.W.2d 111, 112 (S.D. 1964)(finding that the employee was an agent

The ACE policy does not define how to determine who hired the car at issue. Therefore, the Court concludes that the proper test for determining who hired the car involves consideration as to who exercised dominion and control over the car, as well as who had control over (or significantly participated in) the rental transaction, including the payment for the rental. If it is determined that Jacobs had control over or significantly participated in the rental transaction, such will also be evidence that Jacobs gave Wintersteen permission to use the rental car. See Old Republic Ins. Co. v. Whitaker, 2011 WL 13234133, at *3 (W.D. Mo. Nov. 23, 2011). Accordingly, the Court denies all of the parties' motions to the extent that the seek summary judgment on this issue of whether the Hired Autos provision in ACE's insurance policy provides coverage for the accident.

## 2. Non-Owned Autos and Employees as Insureds

Alternatively, Lawrence argues that if Jacobs is found not to have hired the rental car, then the rental car is covered as a Non-owned Auto, and Wintersteen is an insured under the Employees as Insureds provision. (Doc. No. 63-1, p. 104). The ACE policy defines covered "Non-owned 'Autos'" as follows:

> Only those 'autos' [Jacobs] do[es] not own, lease, hire, rent or borrow that are used in connection with [Jacobs'] business. This includes "autos" owned by [Jacobs'] "employees" . . . but only while used in [Jacobs'] business or [Jacobs'] personal affairs.

(Doc. No. 63-8, p. 14). Furthermore, the Employees as Insureds provision states the following:

> Any 'employee' of [Jacobs] is an 'insured' while using a covered 'auto' [Jacobs does not] own, hire, or borrow in [Jacobs'] business or

_____

of her employer when renting the car due in part to the fact that the employee was directed by her employer to rent a car). These cases also analyzed the employer's control over, and involvement in, the rental transaction. See id.

[Jacobs'] personal affairs.

(Doc. No. 63-1, p. 104).

ACE moves for summary judgment as to the applicability of these provisions, arguing that at the time of the accident, Wintersteen was not using the rental car in Jacobs' business or personal affairs.  Therefore, ACE argues that the rental car is not a covered Non-owned Auto, and Wintersteen is not an insured because he was not driving a covered Non-Owned Auto.

Lawrence responds that Wintersteen obtained the rental car in connection with Jacobs' business, because Jacobs hired Wintersteen to perform work for Jacobs in Tampa and Germany, and in exchange, Jacobs agreed to pay his relocation expenses to get him from New Mexico to Germany.  Part of Wintersteen's relocation involved transporting his car to Germany, and as a result, Wintersteen needed transportation in Tampa after his car was shipped to Germany.  Therefore, Lawrence contends that Wintersteen's use of the rental car at the time of the accident (while his personal car was being shipped to Germany) was within Jacobs' business or personal affairs.

ACE responds by pointing out that Wintersteen did not need to use a car in order to perform his duties for Jacobs.  While in Tampa, Wintersteen's job for Jacobs was to be performed at MacDill Air Force Base, and his work was not authorized to be performed outside of a U.S. Government secured work environment.  (Doc. No. 105-8, ¶ 8).  Furthermore, at the time of the accident, Wintersteen was driving the rental car to a store to get orange juice and fruit for his sick daughter.  As such, Wintersteen's use of the rental car to go to the store to buy items for his daughter cannot be said to be a use in Jacobs' business or personal affairs.  The Court agrees with ACE that in order to be a covered Non-owned Auto at the time of the accident,

Wintersteen would have to have been using the rental car while performing company-related work.  See United Financial Cas. Co. v. Smith, 2017 WL 1330559, at *2 (N.D. Cal. Apr. 11, 2017)(citing Union Standard Ins. Co. v. Hobbs Rental Corp., 566 F.3d 950, 953 (10th Cir. 2009)); see also Alaska National Ins. Co. v. Bryan, 125 Wash. App. 24, 31–33 (2004)(finding that an employee's use of his motorcycle to drive a friend to the employer's facility after a night of drinking was not within his employer's business or personal affairs even though the employee-driver was a 24-hour on-call employee and his employer paid to have the motorcycle relocated with him to the remote job site).

In Smith, Brenton Smith worked for a construction company owned by his father, Joshua Smith.  See Smith, 2017 WL 1330559, at *1.  Employees used their own vehicles to get to job sites, and they were required to have their own masonry tools.  See id.  Brenton generally kept his work tools in his car at all times during the work week.  See id.

One night after leaving work and after going home, Brenton went to the beach with his friends and later drove some of his friends home in his car.  See id.  During the drive, Brenton lost control of his car and it crashed.  See id.  At the accident scene, Brenton told the police that the weight of his work tools in the car caused the car to bottom out and crash.  See id.

Brenton sought insurance coverage under his father's commercial auto insurance policy issued by UFCC under the non-owned auto provision.  See id. at *1–2.  That provision covered autos that his father did not own, lease, rent, hire, or borrow and that were used in connection with his father's business.  See id.  Furthermore, the provision stated that it covered autos owned by employees, but only while the autos were used in his father's business or personal affairs.  See id.

In finding that there was no coverage for Brenton under the policy, the court stated the following:

> The UFCC provision here covers "autos owned by [Joshua Smith's] employees . . . but only while such autos are used in [Joshua Smith's] business or [Joshua Smith's] personal affairs." There is no dispute that [Brenton's car] was at times used "in connection with" Joshua Smith's business, as Brenton used it to carry tools and get himself to and from jobsites. But defendants' effort to stretch that fact for coverage of an accident related to an after-hours party goes too far. The phrase "in connection with" must be read in context with the entire provision. Other courts have read similar clauses to mean "while performing company-related work," "to be engaged in [the policy-holder's] business," or while "acting in" the employer's affairs. These are common-sense readings of ordinary words, and they lead to the conclusion that UFCC's coverage obligations extend no further than autos used for Joshua's business or personal affairs at the time damages arise.
>
> Even assuming purely for discussion and in defendants' favor that Brenton was employed by his father, rather than by Smiths Concrete Construction, Inc., there can be no serious dispute that he was not performing work for Joshua's business or Joshua's personal affairs when the accident occurred. Brenton was driving home with friends from a party at the beach. There is no evidence that Brenton went to the beach at Joshua's request. There is no evidence that Joshua instructed all employees to carry tools in their cars at all times for his convenience or that employees were on call 24 hours a day. Brenton was engaged solely in a personal social outing, and so [Brenton's car] was not "used in" the business or personal affairs of his employer at the time of accident.

Id. (internal citations omitted).

Thus, applying Smith to the instant case, in order to be a covered Non-owned Auto at the time of the accident, Wintersteen would have to have been using the rental car while performing company-related work. This conclusion is supported by Hobbs Rental, a case cited by the Smith court.

In Hobbs Rental, HRC's insurance policy's non-owned autos provision covered autos that HRC did not own, lease, hire, rent, or borrow that were used in connection with HRC's business. See Hobbs Rental, 566 F.3d at 953. The non-owned autos provision went on to state that it included autos owned by HRC's employees or members of their household, but only while used in HRC's business or personal affairs. See id., The court construed the phrase "used in connection with" as follows:

> We begin with context. While the policy does not formally define the "in connection with" language, the non-owned auto provision itself supplies the most obvious example of coverage in its second sentence: privately-owned vehicles driven by HRC employees (or members of their household) in the course of HRC business or HRC-related personal affairs.
>
> This second sentence indicates that the provision is intended to cover a more narrow and foreseeable set of circumstances involving HRC employees or members of their household. For example, an employee or family member's vehicle driven to a parts store on company business, or used to haul equipment for HRC, would be covered. Viewing the "in connection with" language in the context of the entire provision thus suggests that instead of covering all autos somehow related to HRC's business, the policy is intended to apply to HRC-affiliated persons operating privately-owned vehicles while performing company-related work.

Id.

The relevant Non-Owned Autos provision in the instant case is almost identical to the provision in Hobbs Rental. Thus, it is not enough that Wintersteen's rental of the car was connected to Jacob's business; instead, at the time of the accident, Wintersteen had to be using the rental car while performing company-related work. Lawrence has failed to point to any evidence that at the time of the accident, Wintersteen was using the rental car while performing company-related work. Accordingly, the Court finds that ACE is entitled to summary judgment as to its argument that its policy does not provide coverage under the Non-owned Autos and

Employees as Insureds provisions.

### B. Equitable Contribution and Unjust Enrichment

USAA asserts claims of equitable contribution and unjust enrichment, arguing that ACE should have paid a large portion of the $250,000 that USAA paid to settle the underlying lawsuit. These claims, however, are based on the contention that the ACE policy provides coverage for the accident. As the Court has found that genuine issues of material fact preclude a finding as a matter of law regarding coverage under the ACE policy, USAA's request for summary judgment on its claims of equitable contribution and unjust enrichment is premature and must be denied.

### C. Reasonableness of Settlement

If the factfinder determines that coverage does exist under the ACE policy, both Lawrence and USAA seek damages from ACE based on the $750,000 consent judgment—Lawrence seeks the remaining $400,000 due under the consent judgment and USAA seeks reimbursement for what it contends that it overpaid under the consent judgment. As a result, both USAA and Lawrence move for summary judgment on the issue of whether the $750,000 settlement of Lawrence's claims in the underlying lawsuit was reasonable.

The general rule is that if an insurance company refuses to assume its contractual obligation and defend its insured, then it is bound by the amount of the settlement, as long as the settlement was not tainted by fraud or collusion. See Sidman v, Travelers Cas. & Surety, 841 F.3d 1197, 1205 (11th Cir. 2016). When a Coblentz agreement[5] is involved, as in this case, the

---

[5]"A Coblentz agreement is a negotiated final consent judgment entered against an insured which was not defended by the insurer. Generally, under a Coblentz Agreement, an insured defendant 'enter[s] into a settlement that assigns to the plaintiff the insured's rights against the insurer in exchange for a release from personal liability.'" Mobley v. Capitol Specialty Ins., 2013 WL 3794058, at *2 (S.D. Fla. July 19, 2013).

analysis of whether the settlement was tainted by fraud or collusion includes analyzing whether

the settlement was unreasonable in amount or negotiated in bad faith.  See id.

ACE does not argue that the settlement was entered into in bad faith, but it does argue

that there is a genuine issue of material fact regarding whether the settlement amount is

unreasonable.  One court has explained the reasonableness inquiry as follows:

> In Florida, the test as to whether the settlement agreement is
> reasonable is "what a reasonably prudent person in the position of the
> defendant [the insurer] would have settled for on the merits of
> plaintiff's claim."  In determining whether a settlement is reasonable,
> a Florida court considers not only such objective factors as the extent
> of plaintiff's injuries, but also "certain subjective factors . . .
> including the degree of certainty of the tortfeasor's subjection to
> liability, the risks of going to trial and the chances that the jury
> verdict might exceed the settlement offer."  The determination of
> whether a settlement is reasonable is made by a "reasonable person
> standard," and is usually established by expert testimony about such
> matters like the extent of defendant's liability, the reasonableness of
> the damages amount in comparison with awards in similar cases, and
> the expense which would have been required for defendant to settle
> the suit.  A court should look to the degree of probability of the
> insured's success and the size of the possible recovery in order to
> determine the reasonableness of the settlement agreement.

See Kehle v. USAA Cas. Ins. Co., 2017 WL 6729186, at *8 (S.D. Fla. Dec. 28, 2017)(internal

citations omitted).  Furthermore, another court explains:

> [T]he settlement amount in a Coblentz agreement that "involve[es]
> a consent judgment with a covenant not to execute" may not
> necessarily represent a realistic valuation of the injured party's claim.
> When an insured "stipulates to a large settlement figure in order to
> obtain his release from liability," it "has little or nothing to lose
> because [it] will never be obligated to pay. As a consequence, the
> settlement of liability and damages may have very little relationship
> to the strength of the plaintiff's claim." Id. [Thus, when a
> Coblentz agreement is involved,] . . . the emergent "settlement figure
> is more suspect" than one produced through a more adversarial
> process. . . . [As a result,] the party seeking to enforce a Coblentz

20

agreement [has] the initial burden of producing "evidence sufficient to make a prima facie showing of reasonableness and lack of bad faith, even though the ultimate burden of proof will rest upon the [insurer sought to be bound]."

Sidman, 841 F.3d at 1202, 1203 (internal citations omitted).

Lawrence and USAA proffer the following regarding the reasonableness of the $750,000 settlement: The claims made by Lawrence against Wintersteen were extensively litigated for over two years. (Doc. No. 104-8, ¶ 4). Substantial discovery was exchanged between the parties. (Doc. No. 104-8, ¶ 4). All of Lawrence's medical and employment records were subpoenaed. (Doc. No. 104-8, ¶ 4). Depositions were conducted of the parties, the significant treating physicians, experts, and other witnesses. (Doc. No. 104-8, ¶ 4). A compulsory medical examination was performed, and the case was mediated. (Doc. No. 104-8, ¶ 4).

The evidence developed in the underling lawsuit showed that Wintersteen's liability was clear, the impact resulting in Lawrence's vehicle being flipped over twice was substantial, and Lawrence sustained severe injuries that were immediately diagnosed at the hospital. (Doc. No. 104-8, ¶ 5). Specifically, medical records and testimony showed that as a result of the accident, Lawrence suffered a lumbar spinal fracture at L1 with edema, a traumatic disc herniation at L4-5 on the left extending into the neural foramina, compression of the L4 and L5 nerve roots, lumbar radiculopathy, traumatic sacroiliitis, cerebral contusions, blood within the interhemispheric fissure of the brain, and a permanent traumatic brain injury. (Doc. No. 104-8, ¶ 5). The underlying medical records and testimony also showed the need for future care consisting of a lumbar microdiscectomy at L4- 5, bilateral SI joint injections, bilateral joint infusion, neuropsychological evaluation to quantify the traumatic brain injury, specific neuropsychological

therapies for the symptoms that will persist the remainder of his life as a result of the traumatic brain injury, and prescription medication for memory and concentration. (Doc. No. 104-8, ¶ 5). Dr. Powell opined that it was his "medical opinion (within a reasonable degree of medical certainty) that Mr. Lawrence ha[d] sustained a permanent injury that includes a traumatic brain injury and lumbar spine injury (both fracture and disc herniation) as well as traumatic sacrolitiitis." (Doc. No. 104-9, p. 5).

Lawrence is a highly-trained, experienced, and decorated military war veteran. (Doc. No. 104-8, p. 4, n.1). He is a former United States Navy SEAL, who retired as a Special Operations Senior Chief Officer with the United States Navy Special Warfare Command. (Doc. No. 104-8, p. 4, n.1). At the time of the accident, Lawrence was employed as an Action Officer with RMGS, Inc. for the Department of the Air Force, United States Special Operations Command, at MacDill Air Force Base. (Doc. No. 104-8, p. 4, n.1). His injuries from the accident have prevented him from working oversees as a special operation contractor, prevented him from continuing to compete in triathlons, restricted his ability to work, to enjoy life, and to maintain the habits, lifestyle, exercise and mentality that have defined him over his lifetime. (Doc. No. 104-8, p. 4, n.1). Since the accident, Mr. Lawrence has been extremely limited in his activities. (Doc. No. 104-8, p. 4, n.1).

The evidence in the underlying case showed past medical expenses in the amount of approximately $60,000, future medical expenses in the amount of $557,000, lost wages in the amount of $24,000, and a loss of earning capacity[6] of $l,030,000. (Doc. No. 104-8, ¶ 6; Doc. No.

_____

[6]There is evidence that due to his experience as a Navy SEAL, Lawrence is sought after for jobs. (Doc. No. 104-11, depo. p. 15–16; Doc. No. 104-12, depo. p. 17–18). However, he has had to turn down job offers due to his inability to physically perform like he used to after the

104-7, depo. p. 14–15).  Additionally, according to Lawrence's attorney, he valued past pain and suffering between $75,000 and  $200,000 and future pain and suffering between $250,000 and $500,000.  (Doc. No. 104-8, ¶ 6).

Prior to setting the car accident case for trial, the case was resolved for $750,000, as memorialized in the consent judgment.  (Doc. No. 104-8, ¶ 4).  In partial satisfaction of the consent judgment, Hertz paid Lawrence $100,000 and USAA paid Lawrence $250,000.  Thus, $350,000 was paid by Hertz and USAA on Wintersteen's behalf.  In exchange for the $350,000 and an agreement not to execute against Wintersteen on the unpaid $400,000, Wintersteen assigned to Lawrence all of his rights against ACE.  The parties negotiated the settlement in order to provide partial immediate recovery to Lawrence.  (Doc. No. 104-8, ¶ 7).

Based on the above, the Court finds that Lawrence and USAA have met their initial burden of producing evidence sufficient to make a prima facie showing of reasonableness of the settlement amount and lack of bad faith in the settlement.  See Szceklik v. Markel International Ins. Co., Ltd., 942 F. Supp.2d 1254, 1269 (M.D. Fla. 2013)(considering similar types of evidence as supporting the reasonableness of the settlement amount).  In response, ACE argues that Lawrence's medical treatment "was far from extensive."  (Doc. No. 107, p. 22).  However, Lawrence stated in his deposition that he wore a back brace from his neck to his groin 24-hours a day for three-and-a-half months, then underwent physical therapy, and then had an epidural. (Doc. No. 106-14, depo. p. 15–17).  Lawrence did state that he did not receive any medical treatment for his head trauma.  (Doc. No. 106-14, depo. p. 17–19).  Additionally, ACE points out

accident.  (Doc. No. 104-11, depo. p. 15–16).

that Lawrence did not undergo surgery.[7]  (Doc. No. 106-14, depo. p. 13–14).  At the time of the accident, doctors advised him that he could undergo surgery or attempt non-surgical options, and Lawrence opted for the non-surgical options.  (Doc. No. 106-14, depo. p. 13–14).

Upon consideration, the Court finds that ACE has not raised a genuine issue of material fact regarding the reasonableness of the settlement amount.  Given Lawrence's pain and suffering, his past medical bills, and his loss of earning capacity, the $750,000 settlement amount is a reasonable estimate of his damages from the car accident.  See United States Automobile Assoc. v. Hartford Ins. Co., 468 So. 2d 545, 547 (Fla. 5th DCA)(finding that a mistaken assessment of damages does not necessarily equate to an unreasonable settlement amount).  Accordingly, the Court grants USAA and Lawrence's motion to the extent that they argue that the $750,000 settlement amount was reasonable.

## IV.  Conclusion

Based on the above, it is ORDERED AND ADJUDGED that:

(1)      USAA's Motion for Summary Judgment (Doc. No. 102) is **GRANTED** to the extent that it argues that the $750,000 settlement amount was reasonable; otherwise, the motion is **DENIED**.

(2)      Lawrence's Motion for Summary Judgment (Doc. No. 104) is **GRANTED** to the extent that he argues that the $750,000 settlement amount was reasonable;

---

[7]ACE also argues that Lawrence went back to work after physical therapy without any restrictions, but ACE does not cite to an evidentiary basis to support this assertion.  (Doc. No. 107, p. 22).  There is evidence that when he returned to work, a stand-up desk was ordered for him, because sitting in a chair was painful.  (Doc. No. 104-11, depo. p. 11).  Furthermore, in the beginning, while wearing the back brace, Lawrence was in extreme pain and was advised "not to do absolutely anything for fear of [him] basically cutting into [his] spinal cord because it was fractured in two locations, so [he] didn't do anything."  (Doc. No. 106-14, depo. p. 40–41).

otherwise, the motion is **DENIED**.

(3)      ACE's Motion for Summary Judgment (Doc. No. 105) is **GRANTED** to the extent that: (a) there is no coverage under the ACE policy under the Non-Owned Autos and Employees as Insureds provisions; (b) USAA and Lawrence cannot seek attorneys' fees pursuant to Florida Statute § 627.428; and (c) USAA and Lawrence's promissory estoppel claims fail.  Otherwise, the motion is **DENIED**.

(4)      The parties must file all pretrial motions, including all motions in limine, by ***June 12, 2019.***  Each party may file ***one*** motion in limine containing all of their arguments in a single document not to exceed 25 pages. Responses thereto must be filed by ***June 25, 2019***.

(5)      The parties must file their joint pretrial statement by ***June 27, 2019.***

**DONE AND ORDERED** at Tampa, Florida, this 3rd day of June, 2019.

_Susan C. Bucklew_
SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record